# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RICHARD RAY ADAMS**, | § | |
| | § | |
| *Plaintiff*, | § | |
| VS. | § | CIVIL ACTION 4:13-CV-495 |
| | § | |
| **CAROLYN W. COLVIN**, | § | |
| Acting Commissioner of Social | § | |
| Security Administration, | § | |
| | § | |
| *Defendant*. | | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of the denial of Social Security benefits, Plaintiff Richard Ray Adams ("Adams") filed a Motion for Summary Judgment pursuant to 42 U.S.C. § 405(g). Doc. 11. Defendant Carolyn W. Colvin ("Commissioner"), Acting Commissioner of Social Security, filed her own Motion for Summary Judgment and Brief in Support. Doc. 12. The parties have consented to have this Court conduct all proceedings, pursuant to 28 U.S.C. § 636(c). Doc. 9. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court orders that Adams' Motion for Summary Judgment is **DENIED** and that the Commissioner's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

Adams is a 46-year old man with a ninth grade education and a GED. Tr. at 34. He has past relevant work experience as a handyman, in body and mechanical work, in industrial painting, as a carpet store operations manager, and as a hazardous materials

technician.  Tr. at 40-43.  Adams suffers from the severe impairment of degenerative disc disease of the lumbar spine.  Tr. at 14.  On November 22, 2010, Adams filed a Title II application for a period of disability and disability insurance while on January 3, 2011 he filed a Title XVI application for supplemental security income benefits.  Tr. at 120, 122. Adams alleges his disability began on January 11, 2010.  *Id.*

### Medical Evidence

On January 21, 2010, Adams visited George W. Cox, M.D., complaining of back pain.  Tr. at 190.  Adams reportedly had been experiencing these symptoms for the last three to four years with increasing severity.  *Id.*  An X-ray of Adams' lumbar spine revealed "facet hypertrophy at L5-S1" resulting in a diagnosis of "mild lumbar radiculopathy."  *Id.*  The next day, a MRI of Adams' lower spine revealed "injury to the inferior aspect of the L3 vertebral body with edema present," a "left paracentral disc protrusion present at L5/S1 [causing] left lateral recess stenosis and central spinal canal stenosis. . . as well as bilateral neuroforamina stenosis," with "posterior disc bulges present at L2/L3-L4/L5."  Tr. at 192.  Dr. Cox described Adams as having a "large herniated disk at L5-S1" that was "significant in size."  Tr. at 194.

On February 4, 2010, Adams saw R. Eric Santos, M.D., complaining of back pain, leg pain, and foot numbness.  Tr. at 375.  Dr. Santos essentially confirmed Adams' previous diagnoses finding "[l]eft sided L5-S1 HNP" and "[r]ight-sided L5-S1 neuroforaminal narrowing."  Tr. at 375.  One week later, Adams visited Dr. Cox complaining of severe right heel pain.  Tr. at 195.  Adams was described as having a "markedly antalgic gait."  *Id.*  He was prescribed 800 mg of Motrin to be taken four times

per day.  *Id.*  Despite his heel pain, Dr. Cox reported that, "Mr. Adams is much better as far as his back and leg pain [is] concerned.  Dr. Santos apparently put him on a Medrol Dosepak."  *Id.*

On March 1, 2010, Adams underwent a right L5 and S1 "epineural injection with local anesthetic and steroids."  Tr. at 197.  The next day, Adams described his general feeling as "[w]onderful," and reported that he was not in any pain.  Tr. at 216.  However, one month later, Adams visited Dr. Santos exhibiting "no significant improvement."  Tr. at 377.  On April 21, 2010, Adams opted for surgery and underwent a right-sided L4-5 and L5-S1 "posterior decompression, foraminotomy, and discectomy" along with a left-sided L5-S1 "posterior decompression."  Tr. at 379.  Approximately two weeks later, Adams' right leg pain was much improved, but his back pain remained unchanged.  Tr. at 382.  On May 27, 2010, Adams reported that his back pain was "coming and going," and Dr. Santos recommended four weeks of physical therapy.  Tr. at 383.  By June 29, 2010, Adams' back and leg pain had returned.  Tr. at 385.

A July 12, 2010 MRI revealed 6 and 7-mm disk protrusions from L3-S1 with "enhanced fibrosis" involving "the right descending L5 nerve root."  Tr. at 387.  Despite these findings, Dr. Santos felt that further surgery would be unhelpful due to the "multilevel involvement."  Tr. at 388.  One month later, Adams received a right L4-S1 "transforaminal injection with local anesthetic and steroids" in an attempt to alleviate his back pain.  Tr. at 271.  While this provided relief for approximately one month, Adams' symptoms eventually returned.  Tr. at 241.

On October 15, 2010, Adams underwent "[p]ercutaneous placement of dual Octrode trial spinal cord stimulator leads" into the epidural space of his spine. Tr. at 268. Four days later, Adams reported that he was pleased with the therapy and that he was "[g]reater than 50% improved." Tr. at 239. On November 10, 2010, "dual Octrode spinal cord stimulator leads and neurostimulator" were implanted into the epidural space of Adams' spine. Tr. at 261. Two months later, Adams reported that he was "happy with the results of the [spinal cord] stimulator," which had "reduced 40% to 50% of his pain." Tr. at 305. By May of 2011, the stimulator results were still "good," but the pain relief was waning. Tr. at 389.

In July of 2011, Adams reported that he was experiencing a loss of feeling in his left arm. Tr. at 344. Adams was diagnosed with "[p]ossible left rotator cuff tendinitis which at times is irritating the lower cervical nerves causing numbness of the hand." Tr. at 347. However, an EMG/NCV of the left upper extremity was "normal." Tr. at 348. In August of 2011, Adams reported that his left hand numbness and tingling had improved, but that his shoulder pain had become worse. Tr. at 355. As a result, Adams received a left shoulder injection that "improve[d] his discomfort somewhat for 2 days." Tr. at 356-57. One week later, Adams received a left C5-C6 "epineural injection with local anesthetic and steroids." Tr. at 358. The epineural injection was repeated on September 14, 2011.

A September 20, 2011 lumbar myelography revealed "L4-L5 mild diminished disk height and endplate osteophytic ridging," "[u]nderfilling of the right exiting L5 nerve sleeve," "[s]ubtle right posterolateral impressions on the thecal sac at the [] right L5

4

pedicle," and "[s]ubtle ventral extradural impressions on the thecal sac at L2-L3 and L3-L4." Tr. at 364-65. Accompanying axial CT images of the lumbar spine demonstrated "subtle facet arthrosis" in L1-2, "mild facet arthrosis" in L2-L4, "moderate facet arthrosis" in L4-L5, disk bulging at L2-S1, and "moderate to marked left and moderate right neural foraminal encroachment" at L4-S1. Tr. at 366-67. CT imaging of Adams' cervical spine revealed similar pathology, resulting in another left C5-C6 "epineural injection with local anesthetic and steroids." Tr. at 368-71.

On November 29, 2011, Adams visited Dr. Santos complaining of neck pain radiating down his arm. Tr. at 391. Dr. Santos noted that Adams' CT myelogram exhibited, "multilevel spondylytic changes with C5-C6 being the worst" along with "neural foraminal narrowing at multiple levels." *Id.* Consequently, Adams elected for surgery and underwent a C5-C6 and C6-C7 ACDF (Anterior Cervical Discectomy and Fusion) on December 12, 2011. Tr. at 393.

### Application for Benefits and ALJ Hearing

On November 22, 2010, Adams applied for social security disability insurance benefits ("SSDI") and on January 3, 2011, applied for supplemental security income benefits ("SSI"). Tr. at 120, 122. Both applications claimed a disability onset date of January 11, 2010. Tr. at 120, 122. Adams' application was initially denied on April 14, 2011, and again upon reconsideration on June 2, 2011. Tr. at 68, 75. He subsequently requested a hearing before an administrative law judge ("ALJ"), which was granted on August 8, 2011. Tr. at 80.

The hearing took place on January 17, 2012 before ALJ Susan J. Soddy.  Tr. at 26.
The ALJ heard testimony from Adams, represented by counsel, and impartial vocational
expert ("VE") Charles R. Poor.  Tr. at 26.  Adams testified about his ninth grade
education and recently obtained GED.  Tr. at 34.  Additionally, Adams stated that he is
currently enrolled in college on a full time basis.  Tr. at 35.  Adams testified that although
he has not worked since January 11, 2010, he volunteered to do demolition work for his
church, resulting in irritation of his back condition.  Tr. at 36, 39.  Adams testified about
his past work experience as a handyman, in body and mechanical work, in industrial
painting, as a carpet store operations manager, and as a hazardous materials technician.
Tr. at 40-43.  Adams also testified about his back condition, surgeries, and treatments.
Tr. at 44-52.  Adams stated that he is not seeking disability benefits for the rest of his life,
and that he would go back to work as soon as his ailments allowed.  Tr. at 53.

VE Poor testified that Adams' past work as a handyman, in hazardous materials,
and in mechanical and body work was medium, skilled work.  Tr. at 55-56.  Adams' past
work as an industrial painter was found to be medium, semi-skilled work, while his work
as an operations manager was found to be heavy, skilled work.  *Id.*  Poor testified that
Adams' acquired the transferable skills of relating to coworkers, receiving and
communicating instructions, interpersonal skills, and record-keeping.  Tr. at 56.
Additional transferable skills were found solely related to medium/heavy work and
largely industrial or industry specific.  Tr. at 56-57.

The ALJ asked VE Poor to assume a hypothetical person who has the same age,
education, and work experience as Adams who retained the residual functional capacity

to perform light work, with the exception of no climbing ladders, scaffolds, or ropes. Tr. at 57. The ALJ specifically excluded fast-paced production jobs. *Id.* This hypothetical individual could also only occasionally bend, stoop, squat, crawl, and crouch. *Id.* The VE responded that such an individual could not perform Adams' past relevant work, but retained sufficient transferable skills to perform the jobs of counter clerk (6,600 regionally, 448,000 nationally), sales clerk (77,000 regionally, 4,400,000 nationally), and general office clerk (42,000 regionally, 1,600,000 nationally). Tr. at 57-58.

When asked to consider the same hypothetical individual who was now limited to sedentary work, the VE responded that such an individual could do the work of a telephone sales agent (5,300 regionally, 345,000 nationally), order clerk (4,200 regionally, 248,000 nationally), and dispatcher (3,900 regionally, 282,000 nationally). Tr. at 58-59. However, if the additional limitations of: (1) severe pain causing periodic loss of concentration and attention to tasks; and (2) difficulties meeting attendant standards compromising the ability to perform work on a regular and continuing basis were added, such a person would be unable to perform any type of work. Tr. at 59-60.

### The ALJ Decision

After the hearing, the ALJ issued a decision that Adams was not disabled from January 11, 2010 through the March 2, 2012 decision date. Tr. at 21. The ALJ found that Adams had acquired sufficient quarters of coverage to remain insured through December 31, 2013, had not engaged in substantial gainful activity since his alleged onset date, and suffers from the severe impairment of degenerative disc disease of the

lumbar spine. Tr. at 14. However, none of Adams' impairments, alone or in combination, were found to meet or medically equal the severity of a listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 16. In reaching her conclusion, the ALJ considered listings pertaining to the musculoskeletal system (1.04). *Id.*

The ALJ evaluated Adams' residual functional capacity ("RFC") and found that he can perform sedentary work limited to occasional bending, stooping, squatting, crawling, and crouching, but no climbing of ladders, scaffolds, or ropes. *Id.* Fast-paced production jobs were specifically excluded. *Id.* Based on this RFC, Adams was found unable to perform any of his past relevant work. Tr. at 19. Nevertheless, the ALJ determined that there were jobs existing in significant numbers in the local and national economies that Adams could perform.[1] Tr. at 20. Accordingly, the ALJ held that Adams was not disabled from January 11, 2010 through the March 2, 2012 decision date. Tr. at 21.

Adams requested a review of the ALJ's decision on March 2, 2012. Tr. at 1. He submitted additional evidence, which the Appeals Council considered and made a part of the record. Tr. at 5. The Appeals Council denied review on January 3, 2013. Tr. at 1. Adams now appeals to this Court and files a motion for summary judgment arguing that the ALJ's decision was in error.

---

[1] Telephone sales agent (5,300 regionally, 345,000 nationally), order clerk (4,200 regionally, 248,000 nationally), and dispatcher (3,900 regionally, 282,000 nationally).

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008); FED. R. CIV. P. 56(a), (c); *Celotex Corp.*, 477 U.S. at 322-23. "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations and quotation marks omitted).

## STANDARD OF REVIEW

Judicial review of the Commissioner's final decision that a claimant is not entitled to benefits is governed by 42 U.S.C. § 405(g). *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). This review is limited to two issues: "(1) whether the decision is supported by substantial evidence on the record as a whole, and (2) whether the Commissioner applied the proper legal standard." *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007). A finding of substantial evidence supporting the Commissioner's decision must "do more than create a suspicion . . . of the fact[s] to be established," while a finding of no substantial evidence is only appropriate if there is a conspicuous absence of "credible evidentiary choices or medical findings" to support the decision. *See Richard ex rel. Z.N.F. v. Astrue*, 480 F. App'x 773, 776 (5th Cir. 2012); *Stringer v. Astrue*, 465 F. App'x. 361, 363-64 (5th Cir. 2012). In applying this standard, the court "may not reweigh the evidence or substitute our judgment for that of the Commissioner." *Audler*, 501 F.3d at 447.

## ANALYSIS

### A. Statutory Basis for Benefits

Adams applied for both Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. SSDI benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into premature retirement, provided they are both insured and disabled. *See* 42 U.S.C. § 423(a). SSI benefits are authorized by Title XVI of the Social Security Act. This program assures a minimal level of income to the aged, blind, and disabled to assure that their standard of living does not fall below the poverty line. 20 C.F.R. § 416.110; *see also* 42 U.S.C. § 1381. Eligibility for SSI is based upon proof of disability and indigence. *See* 42 U.S.C. § 1382. "The law and regulations governing

the determination of disability are the same for both disability insurance benefits and SSI." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); *see also* 42 U.S.C. § 423(d); *and* 42 U.S.C. § 1382c(a)(3)(A).

**B. Determination of Disability**

The Social Security Act defines the term "disability" to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment[s] are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis of a disability claim to determine whether: (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. *See Audler*, 501 F.3d at 447-48; 20 C.F.R. § 404.1520(a). If, at any step, a conclusive disability determination can be made, the inquiry ends. *Id.* The burden of proving disability initially lies with the claimant, but shifts to the Commissioner at the fifth step to show that the claimant can perform other substantial work in the national economy. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding.  *See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

The ALJ found Adams not disabled at step five.  Tr. at 20.   The ALJ concluded that although Adams could no longer perform his past relevant work, he had retained sufficient transferable skills from his prior work such that there were jobs available in significant numbers in the national economy that he could perform.  Tr. at 20.

Adams raises three points of error that he contends entitle him to summary judgment.   First, Adams claims that the ALJ incorrectly determined his severe impairments.   Second, Adams asserts that ALJ improperly rejected the opinion of his treating physician.   Third, Adams claims that the ALJ failed to analyze the *Newton* factors when rejecting the opinion of his treating physician.

## C. The ALJ Correctly Determined Adams' Severe Impairments

Adams challenges the second step in the Commissioner's disability determination, which requires the factfinder to decide whether a claimant's impairment is severe irrespective of age, education, or work experience.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).   The ALJ found that Adams suffers from the severe impairment of degenerative disc disease of the lumbar spine.  Tr. at 14.  Adams contends that the ALJ should have found the additional severe impairment of affective disorder.  In support, Adams offers evidence of "bipolar disorder, type I," "a GAF of 58," and "trouble concentrating and remembering things due to the distraction pain causes."   However, Adams does not explain why this evidence is significant nor does he provide argument of

how the ALJ's analysis was flawed.  Instead, Adams only offers the bare assertion that the ALJ's findings are "contrary to the record."  The Court disagrees.

"[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) (alterations in original); *Henderson v. Colvin*, 520 F. App'x 268, 274 (5th Cir. 2013).  All impairments "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."  20 C.F.R. § 404.1508.

In the applicable law section of his decision, the ALJ correctly set forth the *Stone* standard stating, "[t]o be a severe impairment the medical evidence must establish more than a slight abnormality or a combination of slight abnormalities that would have more than a minimal effect on an individual's ability to work."  Tr. at 14.  Applying *Stone*, the ALJ comprehensively analyzed any potential mental disorders and found that none of them "impose[d] more than a slight limitation on [Adams'] ability to perform basic work functions."  Tr. at 16.

When evaluating the severity of mental impairments, the Commissioner "must follow a special technique at each level in the administrative review process."  20 C.F.R. § 404.1520a(a).  Using this "special technique," the Commissioner is required to: (1) evaluate the pertinent symptoms, signs, and laboratory findings to determine any mental impairments; (2) rate the degree of functional limitation resulting from these impairments; (3) determine the severity of mental impairments; and (4) document

application of the technique. *Id.* § 404.1520a(b)-(e). The Commissioner will rate a claimant's degree of functional limitation in four broad categories: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[2] *Id.* § 404.1520a(c)(3); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C). The first three categories are rated on a five point scale using the descriptors: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). Episodes of decompensation are rated on a four point scale consisting of: none, one or two, three, and four or more. *Id.* The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *Id.* If the claimant's rating is "mild" or less in the first three functional areas and "none" in the fourth, the Commissioner will conclude that the mental impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." *Id.* § 404.1520a(d)(1).

The ALJ found that "Mr. Adams is totally independent in all activities of daily living" and not subject to any limitations. Tr. at 15. The ALJ noted that Adams is "able to perform light cleaning, do the laundry, drive, grocery shop, prepare his meals on a daily basis and care for his children." *Id.* Continuing her analysis, the ALJ found that

_____

[2] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). . . . The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(C)(4).

Adams has only "mild" limitations in social functioning.  *Id.*  The ALJ observed that Adams "was able to talk on the phone with others about once a week," "has friends and family with whom he socializes," can "interact appropriately with the public while shopping and running errands," and "does not have a history of interpersonal relationship difficulties."  *Id.*

In the third step of the ALJ's § 404.1520a evaluation, Adams was found to suffer from "no limitation" in concentration, persistence or pace.  *Id.*  The ALJ observed that Adams can "pay bills, count change, handle a savings account and use a checkbook/money orders."  *Id.*  Additionally, Adams watches television, reads without difficulty, has no deficits in attention and concentration, and his recent and remote memories are intact.  Tr. at 15.  In the last step of her analysis, the ALJ found that "the record is void of evidence of any episodes of decompensation in work or work like settings of extended duration."[3]  *Id.*  The ALJ noted that there is no evidence of psychiatric treatment and that Adams' psychiatric evaluations have been "unremarkable." *Id.*  Consequently, the ALJ found that Adams did not suffer from a severe mental impairment.  Tr. at 15-16.

---

[3] While the ALJ found no episodes of decompensation in "work or work like settings," there is no longer an explicit requirement that these episodes occur at work.  All references to "work or work like settings" were removed from Appendix 1 § 12.00 in 2001.  *Compare* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00 (2011), *with* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00 (2000), *available at* http://www.gpo.gov/fdsys/pkg/CFR-2000-title20-vol2/pdf/CFR-2000-title20-vol2-part404-subpartP-app1.pdf.  Nevertheless, the ALJ's inclusion of this unnecessary language amounts to harmless error as substantial evidence supports the conclusion that there have been no episodes of decompensation of extended duration in any setting.

After review of the record as a whole, substantial evidence supports the ALJ's findings that Adams has no limitation in his activities of daily living, mild limitations in social functioning, no limitations in concentration, persistence or pace, and has experienced no episodes of decompensation. In a "Function Report" dated December 15, 2010, Adams admits that he cares for his children, prepares meals, does light cleaning, and some laundry. Tr. at 164-65. He also drives, shops for groceries, pays his bills, manages his finances, watches TV, and reads. Tr. at 166-67. Adams converses with others at least once per week, but does feel anger and annoyance with family and friends while feeling "more withdrawn." Tr. at 167-68. Adams claims that he does not follow written instructions very well, can "miss things" with spoken instructions, has short-term memory loss, and has difficulty concentrating and completing tasks. Tr. at 168. Adams is able to handle stress "okay," but not changes to his routine. Tr. at 169.

Medical records from Space City Pain Specialist also support the ALJ's findings. For instance, in each of his visits to Space City Pain from February 8, 2010 to October 14, 2011, Adams self-reported psychological symptoms using the clinic's check-the-box form. "Difficulty falling asleep" was the only symptom Adams consistently reported, and many times was the only symptom reported. Tr. at 233, 239, 241, 252, 351, 355. Variably, Adams reported feeling "depression," "anxiety and worry," "repetitive habits," "emotional outburst," or "racing thoughts." Tr. at 231, 237, 243, 245, 342, 373. Adams' "Psychiatric" condition was also recorded while at Space City Pain. This consisted of an analysis of Adams': (1) mood; (2) orientation to time, place, and person; (3) recent and remote memory; and (4) judgment and insight. *See, e.g.*, Tr. at 255. In every visit to

Space City Pain, Adams' "Psychiatric" condition was found to be "all normal." Tr. at 232, 234, 242, 244, 255, 352, 356, 374.

Similarly, on October 5, 2010, Clinical Psychologist Alan H. Silverblatt, Ph.D., "psychologically cleared" Adams for participation in a spinal cord stimulator trial. Tr. at 288. Adams' psychological testing consisted of "the Minnesota Multiphasic Personality Inventory-2 Restructured Form (MMPI-2-RF), Beck Depression Inventory II, Beck Anxiety Inventory, Beck Hopelessness Scale, The Coping Strategy Questionnaire, and the Brief Pain Inventory." *Id.* Dr. Silverblatt found that these results "were <u>not</u> indicative of any serious psychological conditions or personality disorders." *Id.* (emphasis in original).

While the medical record reflects that Adams may suffer from a mood disorder, substantial evidence supports that it was not a severe impairment. For example, on December 2, 2010, Adams visited Mohamed Ahmed, M.D., complaining of "mild depression." Tr. at 302. Dr. Ahmed made an assessment of "mood disorder," but noted that Adams was "very hesitant to try any mood stabilizing agents." Tr. at 303. Three months later, Clinical Psychologist Victor N. Hirsch, Ph.D., reported that Adams takes Oxycarbazepine and that it "somewhat" helps with his psychological symptoms. Tr. at 306. Dr. Hirsch found that Adams had "normal" concentration, "adequate" persistence, and "average" pace. Tr. at 309. Adams could count up by serials of 3 and 7 and count backwards from 100 in serials of 3 to 88. *Id.* Adams was not able to spell "world" backwards. *Id.* Dr. Hirsch diagnosed Adams with bipolar disorder and assigned a GAF score of 58. Tr. at 313.

Finally, on April 1, 2011, state consultant Matthew Turner, Ph.D., completed a "Psychiatric Review Technique" evaluating Adams under Listing 12.04 "Affective Disorders." Tr. at 314. Dr. Turner found that Adams had "mild" restrictions in activities of daily living and social functioning, with "moderate" difficulties maintaining concentration, persistence, and pace. Tr. at 324. There were no episodes of decompensation of extended duration. *Id.* Dr. Turner opined that,

> [Adams] is somewhat limited by psychiatric [symptoms], but the impact of these [symptoms] does not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis. Functional limitations are less than marked. The alleged severity and limiting effects from the impairments are not wholly supported.

Tr. at 326. Adams bears the burden of establishing any severe impairment. *See Henderson v. Colvin*, 520 F. App'x 268, 275. Because the evidence does not "otherwise indicate[] that there is more than a minimal limitation in [Adams'] ability to do basic work activities," substantial evidence supports the determination that Adams does not suffer from a severe mental impairment. *See* 20 C.F.R. § 404.1520a(d)(1).

## D. Dr. Santos' Opinion was not Entitled to Controlling Weight

Adams contends that the ALJ erred by failing to give Dr. Santos' disability opinion the proper weight. A treating physician's opinion on the nature and severity of a claimant's impairment should be accorded "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *Brown v. Astrue*, 344 F. App'x 16, 20 (5th Cir. 2009). "[W]hen good cause is shown, less weight, little weight, or even no weight may be given to the

physician's testimony" when such opinions "are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (quoting *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)).

However, "[c]ontrolling weight may be given only . . . to medical opinions." SSR 96-2P, 1996 WL 374188, (July 2, 1996); *see also* 20 C.F.R. § 404.1527(a)(2) (definition of a medical opinion). "Opinions on some issues . . . are not medical opinions." 20 C.F.R. § 404.1527(d). Rather, they are "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." *Id.* Accordingly, a physician's statement of disability, opinion on a claimant's ability to work, or RFC assessment are not entitled to any "special significance" because they are not "medical opinions." *See* 20 C.F.R. § 404.1527(d); *see also Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

On June 29, 2010, Dr. Santos opined that, "I do not expect [Adams] to be able to go back to any type of employment activities for a minimum [of] a year or two if he is able to return to work." Tr. at 384. The ALJ determined that this opinion was entitled to "no probative weight" because it was unsupported by the objective medical evidence. Tr. at 19. Furthermore, the ALJ found that "Dr. Santos did not provide a definitive assessment of [Adams'] ability to function on a sustained basis but merely opined he could not work." *Id.* Because Dr. Santos' statement was not a medical opinion entitled to any form of special deference, the ALJ did not err in rejecting it. *See Frank*, 326 F.3d at 620; 20 C.F.R. § 404.1527(d).

To the extent that Dr. Santos' statement could be considered a medical opinion, the ALJ had good cause to reject it. Dr. Santos was of the opinion that, "significant lumbar spondylitic disease including L4-5 [and L5-S1] herniated nucleus pulposus" prevented Adams from returning to work. Tr. at 384. However, Dr. Santos conclusory opinion did not attempt to explain how or why these impairments prevented Adams from working, even at only a sedentary level. For instance, there is no clear indication whether Adams' subjective complaints of pain, clinical pathology, or both formed the basis of Dr. Santos' opinion. The only specific limitations placed upon Adams were that "[h]e is going to have restrictions, which will be permanent, but right now, he is in the postoperative period, so we won't know exactly what those will be at this junction." *Id.*

Following Dr. Santos' disability opinion, substantial evidence supports a finding that Adams' lower back condition generally improved. While steroid injections delivered only temporary relief, Adam's spinal cord stimulator provided a "40% to 50%" reduction in pain. Tr. at 305. While by mid-2011 Adams claimed that these improvements were subsiding, his subjective complaints of pain and resulting treatment almost exclusively involved his shoulder and cervical spine, not his lower back. Moreover, Adams' activities of daily living, especially his ability to attend college, are generally incompatible with a claim of total disability. Because Dr. Santos' opinion was "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, [and] otherwise unsupported by the evidence," the ALJ had good cause to reject Dr. Santos' opinion. *See Myers*, 238 F.3d at 621. Accordingly, the ALJ committed no reversible error by rejecting Dr. Santos' opinion.

**E. Analysis of the *Newton* Factors was Unnecessary**

Adams' final point of error contends that the ALJ failed to conduct an analysis of the 20 C.F.R. § 404.1527(d)(2) factors when assigning the appropriate weight to Dr. Santos' opinion. When rejecting or giving little weight to a treating physician's opinion, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)(2)]."[4] *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000). However, "[t]he plain implication of that statement is that where there is reliable medical evidence from a treating or examining physician that controverts the claimant's physician, the detailed inquiry of each factor in [§ 404.1527(c)(2)] is unnecessary." *Rollins v. Astrue*, 464 F. App'x 353, 358 (5th Cir. 2012).

As discussed in the previous section, Dr. Santos' statement that Adams is unable to work is not a medical opinion entitled to any special deference. Thus, the ALJ was not required to analyze the § 404.1527(c) factors. *See Frank*, 326 F.3d at 620 ("The factors set out at subsection [(c)] apply only to medical opinions, not opinions 'reserved to the Commissioner.'"). Furthermore, Adams' case is factually distinct from *Newton*. Unlike *Newton*, the ALJ did not summarily reject the opinion of a treating physician solely based upon the conclusions of a non-examining medical expert. *See Newton*, 209 F.3d at 458. Instead, in rejecting Dr. Santos' opinion, the ALJ relied upon the objective medical

---

[4] The original text in *Newton* refers to "the criteria set forth in 20 C.F.R. § 404.1527(d)(2)," but this section has been renumbered without substantive change to 20 C.F.R. § 404.1527(c)(2).

evidence, records indicating that Adams' lower back surgeries were generally successful at relieving pain, and Adams' reported activities of daily living. *See Meyer v. Barnhart*, 163 F. App'x 347, 348 (5th Cir. 2006) (distinguishing *Newton* on similar grounds); *Zimmerman v. Astrue*, 288 F. App'x 931, 935-36 (5th Cir. 2008) (same). Accordingly, for this additional reason, the ALJ was not required to do a detailed analysis of the § 404.1527(c) factors.

## CONCLUSION

The record reveals that the ALJ applied the correct legal standards in denying Adams' disability benefits. Substantial evidence supports the determination that Adams was not disabled during the relevant time period. A review of the pleadings and the record on file reflects that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(a), (c). Accordingly, the Court rules that Adams' Motion for Summary Judgment is **DENIED** and the Commissioner's Motion for Summary Judgment is **GRANTED**.

SIGNED at Houston, Texas, this 31st day of December, 2014.

George C. Hanks Jr.
United States Magistrate Judge